# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1029

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Kevin Shade, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 19, 2011
Filed: November 29, 2011

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Kevin Shade pleaded guilty to mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and 2. The district court[1] sentenced Shade to 27 months' imprisonment, to be followed by three years of supervised release. On appeal, Shade argues that the district court erred in denying him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because the government failed to prove by a preponderance of the evidence that he recanted his admission to the offense. We affirm.

_____

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

## I. *Background*

Shade was an auto theft detective with the St. Louis Metropolitan Police Department. William and Kenneth Bialczak owned and operated five businesses located in St. Louis, Missouri, including St. Louis Metropolitan Towing and S & H Parking ("S & H"). Gregory Shepard was the general operations manager for S & H. On occasion, S & H applied for Missouri vehicle titles for vehicles towed to S & H that had been abandoned. Shade occasionally conducted automobile inspections for S & H to facilitate its applications for Missouri vehicle titles on abandoned vehicles.

Shade, along with others, was charged in a single count information with knowingly devising and intending to devise a scheme to defraud by material falsehoods the St. Louis Metropolitan Police Department of its material and intangible rights to honest services. The information provided that Shade inspected vehicles on behalf of the department and obtained money and property for himself by means of materially false and fraudulent pretenses from approximately October 2004 to August 2008. According to the information, Shade deliberately passed vehicles for inspection while ignoring obvious significant flaws and subsequently signed Vehicle Examination Certificates—Form 551s—falsely stating that there was no apparent damage or only slight damage to the vehicles. The information identified ten vehicles that Shade falsely passed for inspection.[2] The information stated that Shade received cash payments from Shepard in exchange for performing the phony inspections. Thereafter, the Form 551s, along with additional documentation necessary to obtain title, were delivered to the Missouri Bankers Association, typically via United States mail. The Missouri Bankers Association subsequently delivered the documents to the Missouri Department of Revenue, which returned the original titles to the Missouri Bankers Association. The Missouri Bankers Association then delivered the original

---

[2]The information identifies the following vehicles: (1) a 2004 Chevrolet Blazer, (2) a 2002 Dodge Intrepid, (3) a 1997 Pontiac Grand Prix, (4) a 2001 Ford Focus, (5) a 2005 Chevrolet Cobalt, (6) a 2005 Ford F-150, (7) a 1997 Oldsmobile Delta 88, (8) a 2002 Jeep Liberty, (9) a 2005 Chrysler 300, and (10) a 2002 Ford Taurus.

titles to Park Auto Sales through United States mail or interstate commercial carrier. Park Auto Sales titled and sold a large number of vehicles that St. Louis Metropolitan Towing had towed.

The information further stated that, in furtherance of the scheme to defraud, on approximately October 10, 2006, Shade, along with others, for the purpose of executing the scheme to defraud, caused to be sent, delivered, and moved through United States mail or interstate commercial carrier from the Missouri Bankers Association to Parks Auto Sales an envelope that contained the original title for a 2005 Chevrolet Cobalt, in violation of §§ 1341, 1346, and 2.

On August 10, 2009, Shade agreed to plead guilty in a written plea agreement with the government. In the plea agreement, the parties recommended that three levels be deducted pursuant to U.S.S.G. § 3E.1(a) and (b) from Shade's advisory Guidelines range for acceptance of responsibility. But it further provided that

> [t]he parties agree that if the defendant does not abide by all of the agreements made within this document, the defendant's failure to comply is grounds for the loss of acceptance of responsibility pursuant to Section 3E1.1. The parties further agree that the defendant's eligibility for a reduction pursuant to Section 3E1.1 is based upon the information known at the present time and that *any actions of the defendant which occur or which become known to the government subsequent to this agreement and are inconsistent with the defendant's acceptance of responsibility* including, but not limited to criminal conduct, *are grounds for the loss of acceptance of responsibility* pursuant to Section 3E1.1. In any event, the parties agree that all of the remaining provisions of this agreement remain valid and in full force and effect.

(Emphasis added.)

The plea agreement also contained a stipulation of facts, which provided that Shade "passed vehicles for inspection despite obvious flaws and then signed Vehicle Examination Certificates (Form 551s) falsely stating there was no apparent damage or only slight damage to the vehicles." The stipulation further provided that Shade "received cash payments" from Shepard "[i]n exchange for performing these and other faulty inspections." The stipulation listed the ten vehicles identified in the information as those that Shade had falsely passed for inspection.

During the guilty plea hearing, the district court questioned Shade regarding the plea agreement. Shade confirmed that he signed the plea agreement, read it before he signed it, reviewed it with his attorney, and understood the terms of the plea agreement. He also agreed that everything stated in the plea agreement was true. Thereafter, the government recounted the parties' stipulation of facts. In relevant part, the government informed the court of the following:

> Detective Kevin Shade of the St. Louis Metropolitan Police Department passed vehicles for inspection despite obvious flaws and then signed vehicle examination certificates, which were known as Form 551s, falsely stating there was no apparent damage or only slight damage to vehicles.

> Included in the vehicles falsely passed by Detective Shade were the following. Then, Judge, there is a list of vehicles set forth in the plea agreement. The first one is January—the approximate date of the tow is January 22, 2005, and the vehicle is a 2004 Chevrolet Blazer, and there's a list of several, and the last one is March 20, 2007, and the vehicle is a 2002 Ford Taurus. But again, there are a number of vehicles listed between those in the plea agreement.

> In exchange for performing these and other faulty inspections, Detective Shade received cash payments from Gregory P. Shepard, S & H Parking Systems.

Shade confirmed to the district court that he had, in fact, engaged in the conduct set forth in the parties' stipulation. The district court then accepted Shade's guilty plea.

Prior to the information and Shade's guilty plea, on August 14, 2008, as part of its ongoing investigation into allegations of fraud by S & H, special agents with the Federal Bureau of Investigation (FBI) and the Internal Revenue Service-Criminal Investigation (IRS-CI) had interviewed Shade in the presence of his counsel. At that time, Shade admitted to the agents that he had received cash payments for fraudulently completing the Form 551s at S & H:

> Initially, SHADE denied ever getting cash for conducting inspections on vehicles for S & H. He then changed his story and admitted he did receive cash for inspections. The cash payments began when he began doing inspections. GREG SHEPARD [S & H manager] would approach him and tell him he [Shepard] needed a car inspected. SHEPARD would give SHADE $20.00 to $25.00 for most of the inspections he conducted on vehicles. Sometimes SHADE would arrive at S & H and check the auto theft mail slot. He would retrieve a file and find paperwork for a requested inspection inside with $20.00 to $100.00 in it. This was a sign to SHADE that SHEPARD wanted the inspection to be done. When this occurred, SHADE did not even look at the vehicle. He just filled out the 551 and signed it. SHADE does not know if any of the BIALCZAK brothers are aware of SHEPARD paying him cash for conducting the fraudulent inspections. BILL BIALCZAK is the boss, but it was usually KEN BIALCZAK who would tell SHADE he needed a vehicle inspected. SHADE conducted the inspection for S & H while both on-duty and off-duty. Sometimes SHEPARD would pay him in cash from hand to hand for the inspections. SHADE realized there were times when he conducted an inspection on a vehicle that should not have passed.

In the interview, Shade also

estimat[ed] he received $20–$100 for inspections once or twice a month for the first two years he was working in auto theft. For the past three

years or so, he has only received payments once or twice per quarter. The last time he received a payment was about two weeks prior to the interview where he got $100.00 that was in the file for two inspections.

A presentence investigation report (PSR) was prepared prior to sentencing.[3] In describing the offense conduct, the PSR, like the stipulation contained in the plea agreement, provided that Shade had passed obviously flawed vehicles for inspection and subsequently signed Form 551s in which he falsely stated that the vehicles had little or no damage. Like the information and the plea agreement, the PSR identified ten vehicles that Shade had falsely passed for inspection. The PSR also stated that Shade "reported to investigative agents that he typically received cash amounts between $20 and $100, once or twice a month." Shade filed no objections to the PSR.

On January 6, 2010, pursuant to the cooperation provision of Shade's plea agreement, FBI and IRS-CI special agents again interviewed Shade in the presence of his counsel. During this interview, Shade recanted previous statements made to law enforcement and denied his previously admitted criminal conduct. Specifically, Shade told the agents that

> the money he received in the auto theft files were from Danny's Garage in Pevely. Shade stated the hand to hand payments from Shepard mentioned in the first interview were simply Greg Shepard giving him 20–25 dollars to go out and get his (Shade's) son some dinner. Shade then stated he was paid to do inspections and was not paid to do false inspections. That is what he will testify to.

------

[3]The PSR was prepared on September 10, 2009, and revised on January 5, 2010, April 23, 2010, October 4, 2010, November 3, 2010, December 7, 2010, and December 13, 2010. A final "court amended" PSR was prepared and filed on December 15, 2010, following Shade's sentencing hearing.

-6-

Because of these statements contradicting his plea agreement, on October 1, 2010, the government objected to the PSR's finding that Shade had accepted responsibility. Specifically, the government cited Shade's January 6, 2010 denial of his previously admitted criminal conduct in arguing that Shade should be denied a reduction for acceptance of responsibility. The October 4, 2010 amended PSR accepted the government's position and determined that Shade should not receive a reduction for acceptance of responsibility based upon the January 6, 2010 denial.

The PSR was again amended on November 3, 2010. Paragraph 18 of the amended PSR provided that

> [o]n November 1, 2010, the probation officer met with Shade and his attorney. Shade admitted to the conduct comprising the offense of conviction, as well as to the relevant conduct outlined in the Offense Conduct section of the presentence report.

Based upon Shade's November 1, 2010 interview with the probation officer, the amended PSR once again included a reduction for acceptance of responsibility in its Guidelines calculation.

On December 6, 2010, the government filed an objection to the November 3, 2010 amended PSR, objecting to its recommendation that Shade receive a reduction for acceptance of responsibility. As before, the government's objection was based in large part upon Shade's January 6, 2010 denial of previously admitted criminal conduct. The government also based its objection on Shade's apparent "last minute meeting with representatives of United States Probation on the eve of his most recently scheduled sentencing hearing, outside the presence of any representative of the [government], where [Shade] purportedly admitted enough to trigger the once again revised PSR which now recommends acceptance of responsibility." The government fully incorporated by reference in its objection the FBI reports of Shade's August 14, 2008 and January 6, 2010 interviews.

At sentencing, the district court inquired as to whether Shade had "any objections to the factual statements in the presentence report," and Shade responded that he had none. The government then objected to ¶¶ 18 and 24 of the amended PSR. Paragraph 18 concerned the meeting on November 1, 2010, with the probation office. The government noted that it was not present during the meeting and that nothing in the record suggested what was said or discussed at that meeting. In response, the district court pointed out that Shade had not objected to ¶ 17 of the PSR, which stated:

> According to the Government and FBI reports, on January 11 of 2010, federal law enforcement agents conducted a follow-up interview with Shade in order to obtain additional information relative to Shade's agreement to provide cooperation with the ongoing investigation of Shepard and others. During this interview, Shade recanted previous statements made to law enforcement and falsely denied his previously admitted criminal conduct. In an effort to try to resolve the discrepancies in Shade's statements and admissions, the Government attempted to reinterview Shade. However, he declined any further meetings with the Government.

The government asserted that, based on ¶ 17, Shade should no longer receive a reduction for acceptance of responsibility. In response, Shade asserted that he did not object to ¶ 17 because it was phrased as "according to the Government"; therefore, "it's not stated as a factual finding by the probation department." The court then pointed out that the paragraph actually says "according to the Government and FBI reports which had been filed with the court." Thereafter, Shade determined that, in light of the government's objection, he would "call one of the officers from the probation office to testify." The court then stated, "But it's abundantly clear you don't object to paragraph 17 of the facts stated therein." The following exchange then occurred between the court and Mr. Fein, Shade's counsel:

> MR. FEIN: Your Honor, what I'm not objecting to is that that's the Government's claim. That's why it says "according to." If you look at the

other paragraphs in the PSR, they are not phrased in terms of "according to the Government." They are phrased in terms of factual claims as "the probation office has found." Here they are claiming according to the Government. That is not a fact that they necessarily found.

THE COURT: Except for "according to FBI reports."

MR. FEIN: I understand, but that's—

THE COURT: And reports that have been filed with the Court that say Shade recanted his previous statements and falsely denied his previously admitted conduct.

MR. FEIN: And that claim is based on the claim made previously by the Government in their objections to the PSR to which I did respond.

THE COURT: You want me to just ignore what the FBI says about the interview?

MR. FEIN: No. In fact, if you read my response to the Government's objection, you will see that I claim that they are in error, so I don't see how—

THE COURT: Well, right now if they are in error, you should have objected, because the facts before the Court are, the FBI reports state that Mr. Shade recanted his previous testimony and falsely denied his previous criminal conduct. You're not going to get to individually, as an attorney, say that's not true without any evidence before this Court to say that's not true.

MR. FEIN: Well, two things about that. The report does say that, so it doesn't make sense to claim that the report doesn't say that. It does, in fact, state that.

THE COURT: Okay. But now you're thinking like a lawyer and not like a person. The FBI report, the FBI, the Federal Bureau of Investigation report says that your client recanted his previous statements and falsely

denied his criminal conduct. You're saying, oh, I'm not going to object to the existence of the piece of paper, but that's not what this is about. It's about what the paper says.

MR. FEIN: What the paper says was responded to in the objection in the response that I filed to the Government's objection to the presentence investigation report.

THE COURT: Okay. I'm not going to live in a world that defies common sense, all right? Mr. Goldsmith has objected to paragraph 18.

MR. FEIN: That I can resolve.

Shade then called U.S. Probation Officer Doug Burris to testify regarding ¶ 18 of the PSR. Burris testified that, during the November 1, 2010 meeting, he "asked if [Shade] was in any way denying what he had pled guilty to." He recalled that Shade's response was that

> [h]e was not in any way denying. What he was saying was on the cars listed, he wasn't sure if it was that specific car that he had—he had worked the deal with or if it was another car, similar type or something along those lines. He didn't remember what cars it was that he had worked the deal with.

Burris testified that, based on this interview, "there appeared to be a difference of opinion as to what cars might be involved, but [Shade], in meeting with us, stated very clearly that, yes, he did work an illegal deal that he had pled guilty to on various cars, so [the probation office] . . . decided to include the acceptance."

On cross-examination, Burris admitted that no one from the United States Attorney's office was advised of the meeting. Burris acknowledged that he was aware of prior amendments of the PSR denying Shade acceptance of responsibility and that he did not go through the indictment in detail with Shade. The government asked

-10-

Burris if Burris "aske[d] [Shade] if, in exchange for performing these and other faulty inspections, [Shade] had received cash payments from Gregory P. Shepard, S&H Parking Systems." Burris responded, "We did, and I think that's when the word 'gratuity' came up." Burris understood that the indictment charged Shade with soliciting or receiving bribes in exchange for falsifying automobile inspection certificates. Burris also understood that Shade was *not* charged with accepting a gratuity but instead charged with accepting a bribe. Burris testified that Shade "agreed that he accepted money." When asked whether Shade ever admitted to him that he took bribes in exchange for doing the false reports, Burris replied, "Funds is what he—money is what he said." The government also asked Burris whether he and Shade discussed the circumstances of his recantation. Burris replied:

> I can't remember if it was he or Mr. Fein, it may have been, responded about how the question—they felt that there was questions about the exact cars that were in question, and their position was that they have never denied what he had pled guilty to was on the specific cars.

On redirect examination, Burris remembered Shade explaining that the funds that he received in connection with the 2005 Chevy Cobalt were actually funds that he received for falsely participating and falsely completing the Form 551 in connection with the Cobalt that was ultimately mailed in. According to Burris, Shade admitted to taking money in exchange for the falsification on the Chevy Cobalt. Burris also confirmed that Shade admitted to doing the same on several other cars but could not recall which cars those were.

Thereafter, Shade's counsel commented that, "[w]ith respect to the Cobalt, it was a bribe. With respect to *some other vehicles*, there were bribes as well." (Emphasis added.) The court replied that ten vehicles were listed in both the indictment and the plea agreement and that Shade "told me under oath that in each of those ten vehicles, not just a Cobalt." The court then heard extensive argument from

-11-

Shade's counsel. After considering the evidence and arguments of counsel, the court ultimately concluded:

> Paragraph 18 is going to be amended as follows: On November 1, 2010, the probation office met with Shade and his attorney. Shade admitted to some of the conduct comprising the offense of conviction and discussed possible relevant conduct as outlined in the offense conduct section of the presentence report. That's accurate.

> \* \* \*

> Now, we're going to amend paragraph 24 as follows: On January 6 of 2010, Shade met with the agents of the Federal Bureau of Investigation, St. Louis Division . . . . [a]nd an officer of the Internal Revenue Service, wherein Shade stated the money he received in the auto theft files were from Danny's Garage in Pevely. Shade stated the hand-to-hand payments from Shepard mentioned in the first interview were simply Greg Shepard giving him $20 to $25 to go out with his, Shade's, son—to go out and get his, Shade's son, some dinner. We would now know that's child. Shade then stated he was paid to do inspections and was not paid to do false inspections. That is what he will testify to.

> At a later date, as evidenced in paragraph 18, Shade did admit to some of the conduct comprising the offense of conviction. Period. Shade has provided inconsistent statements since his guilty plea as to the offense conduct—has provided inconsistent statements to law enforcement officials and others as to his offense conduct.

Thereafter, the government objected to the probation officer's finding in ¶ 31 that Shade accepted responsibility and should be given a two-level reduction for that acceptance of responsibility under U.S.S.G. § 3E1.1. The court ultimately denied Shade acceptance of responsibility, explaining:

> A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

-12-

In other words, the mere fact of pleading guilty isn't enough. What I found in the facts section is that at best, Mr. Shade has been inconsistent in his discussions with law enforcement. On one occasion he admitted that he received $20 to $25 for each inspection he made and he received that in hand-to-hand transactions generally from Mr. Shepard.

On the other hand, he later meets again with the FBI and says that he was paid to do inspections and was not paid to do false inspections. And we've had in my mind an incomprehensible discussion today about what he admitted to at his plea agreement under oath and trying to parse and dice and—I understand the distinction between what I vividly recall and what I now know from looking at all the evidence, but he stood in front of me under oath and said that he specifically filed false title applications for ten particular cars on particular dates, and we've had this long discussion about why he can only remember one and why he agrees the Government can prove that but he doesn't know that he did it, that's inconsistent, inconsistent with acceptance of responsibility when confronted with all the evidence of the particular acts, and yet, we're lost at sentencing trying to argue about one car, and yet we admit that there were so many cars we couldn't remember them all. So he's engaged in a pattern of conduct that is inconsistent with acceptance of responsibility by telling the FBI, the FBI, not just a friend, but the FBI, different stories about what happened over a period of time.

So as a result, I am going to grant the United States Attorney's objection, and paragraph 27 will be changed from—paragraph 31. I'm going to take away the two level for acceptance of responsibility and zero that out. As a result, the total offense level in paragraph 32 becomes 16, and the total offense level becomes 16 instead of a 14.

After considering the § 3553(a) factors, the district court sentenced Shade to 27 months' imprisonment, followed by three years' supervised release, and a $100 special assessment.

II. *Discussion*

On appeal, Shade argues that the district court erred in denying him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because the government failed to prove by a preponderance of the evidence that he recanted his admission to the offense. Shade asserts that the claims made by the FBI contained within the PSR were not evidence simply by virtue of their inclusion within the PSR. Shade claims that the government—the party objecting to the PSR's recommendation for the reduction—bore the burden of proving the disputed fact by a preponderance of the evidence. According to Shade, the government failed to offer any evidence to contradict the probation officer's testimony that Shade had, in fact, admitted responsibility for the offense.

"Whether the defendant accepted responsibility is a factual question that depends largely on credibility assessments made by the sentencing court. This Court gives great deference to the district court's denial of a request for a reduction for acceptance of responsibility and reviews the decision for clear error." *United States v. Ayala*, 610 F.3d 1035, 1036 (8th Cir. 2010) (per curiam) (quotation and citation omitted). Contrary to Shade's argument, "[a] defendant bears the burden of establishing entitlement to a reduction for acceptance of responsibility," even where "the probation office recommend[s] that [the defendant] receive the reduction, but the government oppose[s] the reduction." *Id.*

"Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additionally relevant conduct for which he is accountable under § 1B1.3 . . ., will constitute significant evidence of acceptance of responsibility . . . ." U.S.S.G. § 3E1.1 cmt. n.3. But such "evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.* As a result, "[a] defendant who enters a guilty plea is not entitled

to credit for acceptance of responsibility as a matter of right." *United States v. Lee*, 625 F.3d 1030, 1035 (8th Cir. 2010).

At sentencing, the government submitted the FBI reports from Shade's interviews on August 14, 2008, and January 6, 2010. These reports recounted that, in the August 14, 2008 interview, Shade admitted to his criminal conduct; however, in the January 6, 2010 interview, Shade recanted those very admissions, denying his criminal conduct. Based on our thorough review of the record, we conclude that the district court "properly considered the [FBI] report[s]" in "denying [Shade] an acceptance-of-responsibility reduction." *United States v. Curtin*, 1996 WL 697259, at *1, 104 F.3d 364 (8th Cir. 1996) (unpublished table per curiam opinion). "The rules of evidence . . . do not apply in the context of sentencing hearings, and courts may rely on hearsay or other typically inadmissible evidence if that evidence bears sufficient indicia of reliability." *United States v. Azure*, 596 F.3d 449, 454 (8th Cir. 2010). Shade's January 6, 2010 statement contradicted and was inconsistent with his prior statements and admissions for accepting bribes in exchange for falsifying the inspection reports. Therefore, Shade acted in a manner inconsistent with acceptance of responsibility. *See* U.S.S.G. § 3E.1.1 cmt. n.3.

Furthermore, Shade *did not object* to the factual findings contained within the PSR, including ¶ 17, which provides that "[a]ccording to . . . FBI reports . . . Shade recanted previous statements to law enforcement and falsely denied his previously admitted criminal conduct." "[U]nless a defendant objects to a specific factual allegation contained in the PSR, the court may accept that fact as true for sentencing purposes." *Azure*, 596 F.3d at 454 (quotation and citation omitted). Here, the district court could accept as true the PSR's factual finding that Shade had, in fact, recanted his prior statements to law enforcement.

Finally, the probation officer's testimony *does not* undermine the FBI report. The probation officer testified that Shade admitted to taking "money" in exchange for

doing the false reports, not "bribes." And, the probation officer never discussed the circumstances of Shade's recantation. The probation officer also recalled that Shade admitted to taking money in exchange for the falsification on the 2005 Chevy Cobalt. He also confirmed that Shade admitted to doing the same on several other cars *but could not recall which cars those were*. As the district court pointed out, the indictment specifically named ten cars, not just the 2005 Chevy Cobalt. At the change-of-plea hearing, Shade knowingly and voluntarily pleaded guilty to the indictment, which necessarily included the specific ten cars named. By contrast, as evidenced by the probation officer's testimony, Shade could only specifically remember one of those ten cars—the Chevy Cobalt—in his interview with the probation officer. Shade's statement at the interview, therefore, was inconsistent with his guilty plea before the district court.

Therefore, we hold that the district court did not clearly err in denying Shade a reduction for acceptance of responsibility.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____